IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| ROKIT WORLD, INC.<br><br>And<br><br>ROKIT WORLD LIMITED<br><br>  Plaintiffs<br><br>  v.<br><br>WILLIAMS GRAND PRIX ENGINEERING LIMITED<br>Grove, Wantage, Oxfordshire,<br>OX12 0DQ<br><br>And<br><br>CLAIRE WILLIAMS<br>30 Finsbury Square,<br>London,<br>EC2A 1AG<br><br>And<br><br>MICHAEL O'DRISCOLL<br>30 Finsbury Square,<br>London,<br>EC2A 1AG<br><br>And<br><br>DOUG LAFFERTY<br>Aston Martin<br>Banbury Road<br>Gaydon,<br>Warwick,<br>CV35 0DB<br><br>  Defendants. | Case No: 1:23-cv-21224-CMA |

**AMENDED COMPLAINT**

1

Plaintiff ROKIT WORLD, INC. ("RWI") and ROKIT WORLD LIMITED ("RWL") hereby bring suit against Defendants WILLIAMS GRAND PRIX ENGINEERING LIMITED ("Williams Engineering"), CLAIRE WILLIAMS ("Ms. Williams"), MICHAEL O'DRISCOLL ("Mr. O'Driscoll") and DOUG LAFFERTY ("Mr. Lafferty") for fraud.

## JURISDICTION AND VENUE

1. This Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. §1332 as the amount in controversy exceeds $75,000.

2. Venue is proper pursuant to 18 U.S.C. § 1965 and 28 U.S.C. § 1391(b)(2), (3) a substantial part of the events or omissions giving rise to the claims occurred in this judicial district and Defendants are subject to personal jurisdiction in this District.

## THE PARTIES

3. RWI is a corporation and is incorporated under the laws of Delaware. At all material times, RWI was the parent company of ROKiT Marketing, Inc ("RMI") and ROK Marketing, LLC ("ROK"). RWI's principal place of business is California, and it does substantial business all throughout the United States, including but not limited to in Florida. Am. Comp. ¶ 21.

4. RWL is an incorporated entity registered under the laws of Ireland, and it is the parent company of RWI. Its principal place of business is in Ireland and does substantial business worldwide, the United States and in this judicial district.

5. Williams Engineering is a private limited company incorporated in England and Wales. Its principal place of business is England. Williams Engineering does substantial and continued business in Florida and in this judicial district, as one of its two drivers, Logan Sargeant, is a citizen of Florida. Furthermore, William Engineering is competing in the Miami

Grand Prix in May of 2023, and competed in the 2022 Miami Grand Prix as well, a major Formula One ("F1") competition.

6.     Ms. Williams is an individual and a citizen and resident of the United Kingdom. She was until September 3, 2020 a director of Williams Engineering.

7.     Mr. O'Driscoll is an individual and a citizen and resident of the United Kingdom. He was until August 21, 2020 a director of Williams Engineering.

8.     Mr. Lafferty an individual and a citizen and resident of the United Kingdom. He was until August 21, 2020 a director of Williams Engineering.

## STANDING

9.     Plaintiffs have standing to bring claims because they have been directly and proximately harmed by the fraudulent statements of the Defendants set forth herein, which fraudulently induced RWI's subsidiary companies RMI and ROK to enter into sponsorship agreements with Williams Engineering where Plaintiffs' "ROKiT" logo was to be displayed by Williams Engineering. At all material times, this fraud was projected into this judicial district with regard to the Miami Grand Prix in particular.

10.    As a direct and proximate result of the fraudulent statements made by the Defendants, Plaintiffs have suffered significant financial loss and damage to their goodwill and business reputation.

## FACTS
### *Background Facts*

11.    RMI entered into a 3-year Title Sponsorship Agreement with Williams Engineering on January 26, 2019 for the 2019 Formula One Season onwards to the present.

12. Under the terms of this Sponsorship Agreement, Williams agreed to prominently display Plaintiffs' "ROKiT" logo on its cars, driver helmets, mechanic helmets, driver overalls, mechanic overalls, team kit, merchandise kit, and team environment.

13. Plaintiff RWL is licensed to use and sublicense the "ROKiT" logo, and has, in fact sublicensed the "ROKiT" logo to RWI for its own use.

14. In the public's view, the "ROKiT" logo represents the Plaintiffs RWL and RWI, and not the subsidiary companies RMI and ROK. Thus, the reputational and other harm and injury stemming from the fraud alleged herein is directly felt by RWL and RWI, which are licensed to use, and do in fact prominently use the "ROKiT" logo.

15. In 2019 RMI made payments in the total amount of $17,644,482 to Williams Engineering pursuant to the terms of the Title Sponsorship Agreement.

16. The Title Sponsorship Agreement was subsequently extended by an amendment on July 10, 2019, by 2 years. RMI would pay £13,500,000.00 per annum to Williams Engineering. The obligations that Williams Engineering is obligated to perform, in accordance with the contract are in clauses 4.1 to 4.8 of the contract and are as follows:

> 4.1 Williams shall operate the Team and enter the same in the Championship for each year or part thereof for which this Agreement is effective. The Team shall participate in each Race of each such Championship, provided that Williams reserves the right to withdraw (without penalty hereunder, save that for the avoidance of doubt clause 8.2 shall still apply) from any Race where it has reasonable concerns related to the safety or conditions of such Race, and its non-participation is affected in common with at least one (1) other team entered in the Championship (which was a team finishing in the top six (6) places of the Championship for Constructors during the preceding Season) or for compassionate grounds.
>
> 4.2 Subject to clause 4.1, Williams shall enter two Cars in all Races and maintain such levels of engineers, equipment, spare parts, fuel, lubricants, tyres, and staff as Williams in its absolute discretion considers necessary to ensure that both Cars are presented in the highest condition and qualify for entry to the Race.

4.3     During the Term the Team shall conduct itself at all times in a manner appropriate to a professional racing team and do nothing to damage the reputation or goodwill of the Sponsor or any product of the Sponsor or to bring the same into material disrepute.

4.4     Notwithstanding the specific undertakings contained in this Agreement, during the Term Williams shall, so far as is reasonably practicable and appropriate, acknowledge the support of the Sponsor, whether singly or in common with other Team Partners, and seek generally to enhance the image and reputation of the Sponsor in its dealings with the media.

4.5     Williams shall nominate a representative (who at all times shall, as between the Sponsor and Williams be an employee of Williams), for the purposes of liaising with the representative of the Sponsor nominated in accordance with clause 3.5.

4.6     During the Term Williams shall, subject to the Rules, provide the marketing and promotional services to the Sponsor as set out in Schedule 2. Williams undertakes that it has not granted, and will not at any time during the Term grant, to any person, any rights or benefits similar to or the same as those granted to the Sponsor in this Agreement for exploitation in the categories detailed in the Sponsor's Business (or any or all of them). Williams hereby confirms that the Drivers have not entered into, and will procure (by way of an applicable provision in the agreement between Williams and the Driver) that the Drivers will not at any time during the Term enter into, any sponsorship or endorsement agreement or arrangement with any person for exploitation in the categories detailed in the Sponsor's Business (or any or all of them).  For the avoidance of doubt, nothing in this clause 4.6 will prevent Williams from entering into a sponsorship agreement with a provider of a mobile network operator where such sponsorship agreement includes the provision of business services to Williams in respect of its operation as a Team in the Championship.

4.7     Williams acknowledges that all intellectual property rights (including, without limitation, trade mark rights, copyright and registered design rights) in respect of the Sponsor Group's and Sponsor's name, logo, trade marks and all other proprietary material of the Sponsor Group and Sponsor shall remain both during the Term and thereafter the property of the Sponsor or applicable member of the Sponsor Group.  Williams further acknowledges that this Agreement does not operate to vest any right, title or interest to or in such Sponsor trade marks or proprietary material.

4.8     Williams hereby represents and warrants that the use by the Sponsor of: (a) the Williams' trade marks; (b) other proprietary material of Williams detailed hereunder; and (c) the marketing and promotional services provided by Williams as set out in Schedule 2; in accordance with the terms hereof:
(i)     in each territory in which a Race is held as at the date hereof;

5

(ii) in the United Kingdom;
(iii) in any territory within the European Union; and/or
(iv) to the best of Williams' knowledge, other than as set out in sub-clauses (i), (ii) and (iii) above (but, for the avoidance of doubt, in accordance with this Agreement), shall not infringe the rights of any third party.

17.  ROK entered into a 4-year Drinks Sponsorship Agreement with Williams Engineering on October 22, 2019, for the 2020 Formula One Season onwards to the present.

18.  Under the terms of this Sponsorship Agreement, Williams agreed to prominently display Plaintiffs' "ROKiT" logo on its cars, driver helmets, driver caps, driver overalls, mechanic overalls, team kit, merchandise kit, and team environment, along with the logos from Plaintiffs' alcoholic drinks, Bogart's, ABK, and/or Bandero, or ROKiT Smart Cities and/or ROKiT Phones.

19.  The obligations that Williams Engineering is obligated to perform, in accordance with the contract are in clauses 4.1 to 4.8 of the contract and are as follows:

> 4.1   Williams shall operate the Team and enter the same in the Championship for each year or part thereof for which this Agreement is effective. The Team shall participate in each Race of each such Championship, provided that Williams reserves the right to withdraw (without penalty hereunder, save that for the avoidance of doubt clause 8.2 shall still apply) from any Race where it has reasonable concerns related to the safety or conditions of such Race, and its non-participation is affected in common with at least one (1) other team entered in the Championship (which was a team finishing in the top six (6) places of the Championship for Constructors during the preceding Season) or for compassionate grounds.
>
> 4.2   Subject to clause 4.1, Williams shall enter two Cars in all Races and maintain such levels of engineers, equipment, spare parts, fuel, lubricants, tyres, and staff as Williams in its absolute discretion considers necessary to ensure that both Cars are presented in the highest condition and qualify for entry to the Race.
>
> 4.3   During the Term the Team shall conduct itself at all times in a manner appropriate to a professional racing team and do nothing to damage the reputation or goodwill of the Sponsor or any product of the Sponsor or to bring the same into material disrepute.

4.4     Notwithstanding the specific undertakings contained in this Agreement, during the Term Williams shall, so far as is reasonably practicable and appropriate, acknowledge the support of the Sponsor, whether singly or in common with other Team Partners, and seek generally to enhance the image and reputation of the Sponsor in its dealings with the media.

4.5     Williams shall nominate a representative (who at all times shall, as between the Sponsor and Williams be an employee of Williams), for the purposes of liaising with the representative of the Sponsor nominated in accordance with clause 3.5.

4.6     During the Term Williams shall, subject to the Rules, provide the marketing and promotional services to the Sponsor as set out in Schedule 2. Williams undertakes that it has not granted, and will not at any time during the Term grant, to any person, any rights or benefits similar to or the same as those granted to the Sponsor in this Agreement for exploitation in the categories detailed in the Sponsor's Business (or any or all of them). Williams hereby confirms that the Race Drivers have not entered into, and will procure (by way of an applicable provision in the agreement between Williams and the Race Driver) that the Race Drivers will not at any time during the Term enter into, any sponsorship or endorsement agreement or arrangement with any person for exploitation in the categories detailed in the Sponsor's Business (or any or all of them).  For the avoidance of doubt, nothing in this clause 4.6 will prevent Williams from entering into a sponsorship agreement with a provider of a mobile network operator where such sponsorship agreement includes the provision of business services to Williams in respect of its operation as a Team in the Championship.

4.7     Williams acknowledges that all intellectual property rights (including, without limitation, trademark rights, copyright and registered design rights) in respect of the Sponsor Group and Sponsor's name, Sponsor's Logo, trademarks and all other proprietary material of the Sponsor Group and Sponsor shall remain both during the Term and thereafter the property of the Sponsor or applicable member of the Sponsor Group.  Williams further acknowledges that this Agreement does not operate to vest any right, title or interest to or in such Sponsor trademarks or proprietary material save for the rights granted to Williams pursuant to this Agreement.

4.8     Williams hereby represents and warrants that the use by the Sponsor of: (a) the Williams' trademarks; (b) other proprietary material of Williams detailed hereunder; and (c) the marketing and promotional services provided by Williams as set out in Schedule 2; in accordance with the terms hereof:
(i)     in each territory in which a Race is held as at the date hereof;
(ii) in the United Kingdom;
(iii) in any territory within the European Union; and/or

(iv) to the best of Williams' knowledge, other than as set out in sub-clauses (i), (ii) and (iii) above (but, for the avoidance of doubt, in accordance with this Agreement), shall not infringe the rights of any third party.

20. These two agreements are hereafter referred to as the "Sponsorship Agreements."

21. In March of 2020, as a result of COVID-19, Formula One ("F1") postponed the 2020 racing season until further notice. Specifically, on or around March 12, 2020, it was announced that the Australian Grand Prix, which was scheduled for March 13-15, 2020, would not commence, due to COVID-19 regulations, and after that, a number of the races were postponed or cancelled, including the Miami Grand Prix, which would have been held in this judicial district. The 2020 Formula One Season was compromised due to COVID-19 regulations.

22. Furthermore, on or around October 14, 2019, Defendants were informed that the color scheme of the F1 car was a breach of clause 3.8 of the Sponsorship Agreements between the parties. The color scheme was eventually corrected, but the signage was still not right and not the right size. This governing provision of the Sponsorship Agreements stated:

> **[ROKiT Marketing Inc.] RMI Title Sponsorship -** The Sponsor acknowledges that Williams shall at all times have full responsibility for and control of the Team and of its participation in any Race or other activity undertaken by the Team and that Williams shall exclusively determine all matters in relation thereto. Williams acknowledges and agrees that the colour scheme applied to Cars used in Races and tests from the 2020 Championship Season onwards shall be mutually agreed in good faith. Further, the Sponsor acknowledges and agrees that such colour scheme needs to be decided and agreed expeditiously following Williams' request during the preceding Seasons (as applicable) and, as such, the Sponsor agrees that its agreement in respect of such colour scheme shall not be unreasonably withheld, delayed or conditioned.
>
> **[ROK Marketing, LLC] RML Drinks Sponsorship -** The Sponsor acknowledges that Williams shall at all times have full responsibility for and control of the Team and of its participation in any Race or other activity undertaken by the Team and that Williams shall exclusively determine all matters in relation thereto. Williams acknowledges and agrees that the color scheme applied to Cars used in Races and tests from the 2020 Championship Season onwards shall be mutually agreed in good faith by the parties and that the color scheme shall not be changed (whether for the 2020 Championship Season from

the color scheme applied to Cars used in Races and tests in the 2019 Championship Season or from the color scheme applied to Cars used in Races and tests in subsequent Championship Seasons as agreed by the parties) without the prior written approval of the Sponsor.

23. Defendants refused to remedy this breach of clause 3.8 of the Sponsorship Agreements and never used the correct size of the Sponsor's logos.

24. Then, on or around April 6, 2020 it was announced that Williams Engineering was furloughing some of its staff and that senior management and drivers would have a pay cut of 20% effective from April 1st 2020 as a result of the Formula One season being compromised due to COVID-19 regulations, a clear sign that Williams Engineering was in dire financial straits.

25. Not coincidentally, on or around April 7, 2020, Defendants wrote to RMI and ROK and alleged that they had breached both Sponsorship Agreements due to non-payment of the first and second installments, as well as, in relation to RMI, a "bonus" payment of $1,000,000.00 USD. Williams intentionally damaged Plaintiffs' reputation by disclosing the non-payment to the media before even informing the Plaintiffs. This was done intentionally to cause Plaintiffs as much damages as possible, reputational and otherwise.

26. In response, RMI wrote:

"The first instalment of the Fee in 2020 covers the period from 1st January 2020 to 14th May 2020 (inclusive). From the date of cancellation of the Australian Grand Prix ROKiT has not received the majority of rights under the Agreement and with the cancellation of the Monaco Grand Prix, suspension of numerous further races and the virtual certainty that additional races will be suspended or cancelled in 2020 (if the Season even goes ahead) ROKiT will not receive the majority of rights under the Agreement in 2020. We find it surprising that we have received no correspondence or proposals from Williams in relation to lost rights as a result of the impact of Covid 19 on Formula One, just a claim for payment and threats in relation thereto. That being said, we are willing to make payment of the first instalment of the Fee in 2020 by 15th May 2020 without prejudice to our rights and remedies under the Agreement and in law. We look forward to your proposals

9

to compensate us for the loss of rights to date under the Agreement and moving forward as a matter of urgency.

Mr. Kendrick personally proposed a gift of $1m to Williams and finds it distasteful that you are now seeking to claim that non-payment constitutes a breach of the Agreement. Mr. Kendrick will make the payment of $1,000,000 personally to Williams by 15th May 2020 provided that you confirm that the invoice issued by Williams in relation thereto will be cancelled forthwith and that Williams irrevocably waives any claims it may have in relations to the said $1,000,000 and undertakes not to make any claim against ROKiT or any of its affiliates in relation to the said $1,000,000.

The second instalment of the Fee in 2020 covers the period from 15th May 2020 to 27 September 2020 (inclusive) and in all likelihood ROKiT will not receive the majority of rights under the Agreement during that period. Accordingly we are not willing to make payment of the second instalment until we receive your proposals on, and agree, the way forward.

Williams has breached a number of the provisions of the Agreement and we reserve our rights in relations to such breaches. In particular:

(i) The colour scheme applied to the cars is not as agreed between the parties in Barcelona at this Season's testing, in breach of clause 3.8 of the Agreement. The signage is not the agreed size and the Team Kit, garage and all other signage do not match the car colours or our brand colours;

(ii) ROKiT has not received the majority of rights under the Agreement since cancellation of the Australian Grand Prix;

(iii) Williams has breached the confidentiality obligations in clause 15 of the Agreement by disclosing non-payment by ROKiT to Formula One World Championship Limited ("FOWC")

(iv) Williams has damaged the reputation or goodwill of ROKiT and brought the same into material disrepute in breach of clause 4.3 of the Agreement by disclosing non-payment by ROKiT to FOWC which lead to a sponsorship opportunity with FOWC being withdrawn; and

(v) Williams is in breach of the representation, undertaking and warranty in clause 5.3(a) of the Agreement.

We are surprised at your lack of any attempt to communicate or discuss proposals on the way forward and look forward to hearing from you in relation thereto as a matter of urgency. In our view the Agreement may in any event have been terminated due to Frustration. ROKiT hereby reserves all rights and remedies it

may have under the Agreement and in law. Nothing in this letter is or is intended to constitute a waiver of any rights that ROKiT may have."

27.     Furthermore, in response, ROK wrote

"The first instalment of the Fee in 2020 covers the period from 1st January 2020 to 14th May 2020 (inclusive). From the date of cancellation of the Australian Grand Prix ROK has not received the majority of rights under the Agreement and with the cancellation of the Monaco Grand Prix, suspension of numerous further races and the virtual certainty that additional races will be suspended or cancelled in 2020 (if the Season even goes ahead) ROK will not receive the majority of rights under the Agreement in 2020. We find it surprising that we have received no correspondence or proposals from Williams in relation to lost rights as a result of the impact of Covid 19 on Formula One, just a claim for payment and threats in relation thereto. That being said, we are willing to make payment of the first instalment of the Fee in 2020 by 15th May 2020 without prejudice to our rights and remedies under the Agreement and in law. We look forward to your proposals to compensate us for the loss of rights to date under the Agreement and moving forward as a matter of urgency.

The second instalment of the Fee in 2020 covers the period from 15th May 2020 to 27 September 2020 (inclusive) and in all likelihood ROK will not receive the majority of rights under the Agreement during that period. Accordingly we are not willing to make payment of the second instalment until we receive your proposals on, and agree, the way forward.

Williams has breached a number of the provisions of the Agreement and we reserve our rights in relations to such breaches. In particular:

(i) The colour scheme applied to the cars is not as agreed between the parties in Barcelona at this Season's testing, in breach of clause 3.8 of the Agreement. The signage is not the agreed size and the Team Kit, garage and all other signage do not match the car colours or our brand colours;

(ii) ROK has not received the majority of rights under the Agreement since cancellation of the Australian Grand Prix;

(iii) Williams has breached the confidentiality obligations in clause 15 of the Agreement by disclosing non-payment by ROK to Formula One World Championship Limited ("FOWC")

(iv) Williams has damaged the reputation or goodwill of ROK and brought the same into material disrepute in breach of clause 4.3 of the Agreement by disclosing non-payment by ROK to FOWC which lead to a sponsorship opportunity with FOWC being withdrawn; and

11

(v) Williams is in breach of the representation, undertaking and warranty in clause 5.3(a) of the Agreement.

We are surprised at your lack of any attempt to communicate or discuss proposals on the way forward and look forward to hearing from you in relation thereto as a matter of urgency. In our view the Agreement may in any event have been terminated due to Frustration. ROK hereby reserves all rights and remedies it may have under the Agreement and in law. Nothing in this letter is or is intended to constitute a waiver of any rights that ROK may have."

28. Ultimately, the parties were unable to resolve the issue informally, and an arbitration was held in the London Court of International Arbitration. LCIA Arbitration Case No. 204960. The arbitrator ultimately sided with Williams Engineering, but crucially, the arbitrator was not aware of the fraudulent concealment of statements of material facts by Defendants that were not discovered until after the arbitration had concluded.

### *Facts Pertaining to Defendants' Fraud*

29. After the arbitration had concluded and Williams Engineering had received a favorable decision, Plaintiffs learned that the car was never capable of performing to the standards that Defendants had guaranteed to the Plaintiffs, and that Defendants were aware of and concealed this fact.

30. In a meeting with Defendants, prior to the execution of the Sponsorship Agreements, on or about January 18, 2019 at Williams Engineering headquarters in Grove, Defendants Ms. Williams, Mr. O'Driscoll, and Mr. Lafferty made fraudulent statements and guarantees to Mr. Jonathan Kendrick, and in the presence of Mr. Bruce Renny, and Mr. Chris Welsh, that claimed that the F1 car which would be subject to the Sponsorship Agreements, had industry leading performance capabilities including a Mercedes-Benz engine and would have excellent chances to be competitive, would place in the upper side of the leaderboard, and would not be slower than the 2018 Williams F1 car.

31. Specifically, Defendants informed Plaintiffs' subsidiaries ROK and RMI that they had hired Paddy Lowe ("Mr. Lowe"), the ex-technical director of Mercedes Formula One - a legend in the industry – and that Mr. Lowe would be able to develop the F1 car to competitive standards which would be subject to the Sponsorship Agreements.

32. However, Defendants intentionally and fraudulently concealed the fact that Williams Engineering simply did not have enough money to develop the F1 car which would be subject to the Sponsorship Agreements to an industry leading standard, and therefore Defendants knew that the F1 car which would be subject to the Sponsorship Agreements had no chance to be competitive, or at the least place in the upper side of the leaderboard, and actively concealed this fact from the Plaintiffs' subsidiaries ROK and RMI.

33. These statements and guarantees by Defendants fraudulently induced RMI and ROK to enter into the Sponsorship Agreements with Williams Engineering, as Plaintiffs would only receive the main benefit of their Sponsorship Agreements if the F1 car bearing their "ROKiT" logo was competitive, or at the least place in the upper side of the leaderboard.

34. Thus, had Plaintiffs known that the F1 car that would be the subject of the Sponsorship Agreements with Williams Engineering was grossly substandard and had no chance of being competitive, Plaintiff RWI's subsidiaries RMI and ROK would never have entered into any Sponsorship Agreements with Williams Engineering to display Plaintiffs' "ROKiT" logo.

35. The F1 car that would be subject to the Sponsorship Agreement was the slowest car in F1 since 2019 and by such a wide margin as to be completely uncompetitive and consistently finished in the bottom half of the leaderboard and almost always in the last place.

36. Defendants knew this, and this is why they concealed this material fact, and instead made fraudulent representations and guarantees that the F1 car which would be subject to

the Sponsorship Agreements had industry leading performance capabilities and would be competitive and at least place in the upper side of the leaderboard.

37. Accordingly, as a direct and proximate result of the fraudulent statements made by Defendants set forth herein, Plaintiffs suffered a direct injury because they were fraudulently induced by the Defendants to display their "ROKiT" logo on Williams cars that were substandard and non-competitive, which severely damaged their goodwill and business reputation.

38. As a direct and proximate result of Plaintiff RWI's subsidiaries RMI and ROK being fraudulently induced into entering into the Sponsorship Agreements with Williams Engineering, and Williams Engineering's subsequent fraudulent claims for breach of contract that were widely publicized to the media, Plaintiffs suffered severe damage and harm to their goodwill and business reputation because Defendants' statements to the media created the false impression that "ROKiT," had breached the Sponsorship Agreements, not RMI and ROK. Thus, the reputational harm and damage was directly done to Plaintiffs, who are licensed to use the "ROKiT" logo, and do, in fact, prominently use the "ROKiT" logo.

## CAUSES OF ACTION
### Count 1 – *Fraud*
### *Defendant Williams Engineering*

39. Defendant Williams Engineering made a fraudulent statement of material fact that the F1 car which would be subject to the Sponsorship Agreements between the parties had industry leading performance capabilities and would be competitive or at least place in the upper side of the leaderboard.

40. Defendant Williams Engineering made an omission of a material fact when it fraudulently concealed the fact that the F1 car that would be the subject of the Sponsorship

Agreements between the parties was never capable of performing to the standards that Defendant Williams Engineering had guaranteed to the Plaintiffs.

41. Defendant Williams Engineering was aware of the false nature of the statement that the F1 car which would be subject to the Sponsorship Agreements between the parties had industry leading performance capabilities and would be competitive or at least place in the upper side of the leaderboard and was also aware that that the F1 car that would be the subject of the Sponsorship Agreements between the parties was never capable of performing to the standards that Defendant Williams Engineering had guaranteed to the Plaintiffs.

42. Defendant Williams Engineering made this false statement and false omission with the intent that the Plaintiffs would rely on them, as Williams Engineering desperately needed a cash infusion in order to sustain operations.

43. Plaintiffs relied on Defendant Williams Engineering's fraudulent statements and false omissions, as it is indisputable that a car which is not competitive is clearly one that no sponsor would want to attach their name, brand, and reputation to, and Plaintiffs are no different. Thus, had Plaintiffs known that the F1 car that would be the subject of the Sponsorship Agreements with Williams Engineering had no chance of being competitive, RWI's subsidiaries RMI and ROK would never have entered into any Sponsorship Agreements with Williams Engineering to display Plaintiffs' "ROKiT" logo.

44. As a result of the fraudulent and false statement and omission by Defendant Williams Engineering, Plaintiff RWI's subsidiaries RMI and ROK entered into the Sponsorship Agreements with Williams Engineering and as a direct and proximate cause, Plaintiffs suffered severe damage both financially, as well as to their goodwill and business reputation.

**CAUSES OF ACTION**
**Count 2 –** *Fraud*

### *Defendant Ms. Williams*

45. Defendant Ms. Williams made a fraudulent statement of a material fact that the F1 car which would be subject to the Sponsorship Agreements between the parties had industry leading performance capabilities and would be competitive or at least place in the upper side of the leaderboard.

46. Defendant Ms. Williams made an omission of a material fact when she fraudulently concealed the fact that the F1 car that would be the subject of the Sponsorship Agreements between the parties was never capable of performing to the standards that Defendant Ms. Williams had guaranteed to the Plaintiffs.

47. Defendant Ms. Williams was aware of the false nature of the statement that the F1 car which would be subject to the Sponsorship Agreements between the parties had industry leading performance capabilities and would be competitive or at least place in the upper side of the leaderboard and was also aware that that the F1 car that would be the subject of the Sponsorship Agreements between the parties was never capable of performing to the standards that Defendant Ms. Williams had guaranteed to the Plaintiffs.

48. Defendant Ms. Williams made this false statement and false omission with the intent that the Plaintiffs would rely on them, as Williams Engineering desperately needed a cash infusion in order to sustain operations.

49. Plaintiffs relied on Defendant Ms. Williams' fraudulent statements and false omissions, as it is indisputable that a car which is not competitive is clearly one that no sponsor would want to attach their name, brand, and reputation to, and Plaintiffs are no different. Thus, had Plaintiffs known that the F1 car that would be the subject of the Sponsorship Agreements with Williams Engineering had no chance of being competitive, Plaintiff RWI'S subsidiaries

RMI and ROK would never have entered into any Sponsorship Agreements with Williams Engineering to display Plaintiffs' "ROKiT" logo.

50. As a result of the fraudulent and false statement and omission by Defendant Ms. Williams, Plaintiff RWI's subsidiaries RMI and ROK entered into the Sponsorship Agreements with Williams Engineering and as a direct and proximate cause, Plaintiffs suffered severe damage both financially, as well as to their goodwill and business reputation.

## CAUSES OF ACTION
### Count 3 – *Fraud*
### *Defendant Mr. O'Driscoll*

51. Defendant Mr. O'Driscoll made a fraudulent statement of material fact that the F1 car which would be subject to the Sponsorship Agreements between the parties had industry leading performance capabilities and would be competitive or at least place in the upper side of the leaderboard.

52. Defendant Mr. O'Driscoll made an omission of a material fact when he fraudulently concealed the fact that the F1 car that would be the subject of the Sponsorship Agreements between the parties was never capable of performing to the standards that Defendant Mr. O'Driscoll had guaranteed to the Plaintiffs.

53. Defendant Mr. O'Driscoll was aware of the false nature of the statement that the F1 car which would be subject to the Sponsorship Agreements between the parties had industry leading performance capabilities and would be competitive or at least place in the upper side of the leaderboard and was also aware that that the F1 car that would be the subject of the Sponsorship Agreements between the parties was never capable of performing to the standards that Defendant Mr. O'Driscoll had guaranteed to the Plaintiffs.

54. Defendant Mr. O'Driscoll made this false statement and false omission with the

intent that the Plaintiffs would rely on them, as Williams Engineering desperately needed a cash infusion in order to sustain operations.

55. Plaintiffs relied on Defendant Mr O'Driscoll's fraudulent statements and false omissions, as it is indisputable that a car which is not competitive is clearly one that no sponsor would want to attach their name, brand, and reputation to, and Plaintiffs are no different. Thus, had Plaintiffs known that the F1 car that would be the subject of the Sponsorship Agreements with Williams Engineering had no chance of being competitive, Plaintiff RWI's subsidiaries RMI and ROK would never have entered into any Sponsorship Agreements with Williams Engineering to display Plaintiffs' "ROKiT" logo.

56. As a result of the fraudulent and false statement and omission by Defendant Mr O'Driscoll, Plaintiff RWI's subsidiaries RMI and ROK entered into the Sponsorship Agreements with Williams Engineering and as a direct and proximate cause, Plaintiffs suffered severe damage both financially, as well as to their goodwill and business reputation.

**CAUSES OF ACTION**
**Count 4 –** *Fraud*
***Defendant Mr. Lafferty***

57. Defendant Mr. Lafferty made a fraudulent statement of material fact that the F1 car which would be subject to the Sponsorship Agreements between the parties had industry leading performance capabilities and would be competitive or at least place in the upper side of the leaderboard.

58. Defendant Mr. Lafferty made an omission of a material fact when he fraudulently concealed the fact that the F1 car that would be the subject of the Sponsorship Agreements between the parties was never capable of performing to the standards that Defendant Mr. Lafferty had guaranteed to the Plaintiffs.

59. Defendant Mr. Lafferty was aware of the false nature of the statement that the F1 car which would be subject to the Sponsorship Agreements between the parties had industry leading performance capabilities and would be competitive or at least place in the upper side of the leaderboard and was also aware that the F1 car that would be the subject of the Sponsorship Agreements between the parties was never capable of performing to the standards that Defendant Mr. Lafferty had guaranteed to the Plaintiffs.

60. Defendant Mr. Lafferty made this false statement and false omission with the intent that the Plaintiffs would rely on them, as Williams Engineering desperately needed a cash infusion in order to sustain operations.

61. Plaintiffs relied on Defendant Mr. Lafferty's fraudulent statements and false omissions, as it is indisputable that a car which is not competitive is clearly one that no sponsor would want to attach their name, brand, and reputation to, and Plaintiffs are no different. Thus, had Plaintiffs known that the F1 car that would be the subject of the Sponsorship Agreements with Williams Engineering had no chance of being competitive, Plaintiff RWI's subsidiaries RMI and ROK would never have entered into any Sponsorship Agreements with Williams Engineering to display Plaintiffs' "ROKiT" logo.

62. As a result of the fraudulent and false statement and omission by Defendant Mr. Lafferty, Plaintiff RWI's subsidiaries RMI and ROK entered into the Sponsorship Agreements with Williams Engineering and as a direct and proximate cause, Plaintiffs suffered severe damage both financially, as well as to their goodwill and business reputation.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for judgment against Defendants as follows:

a. Awarding Plaintiffs compensatory including actual, consequential, incidental for

malicious tortious concerted conduct, jointly and severally, in an amount in excess of $149,528,550 dollars or in an amount to be determined at by a jury at trial.

    b.    Awarding Plaintiffs punitive damages in an amount to be determined by jury.

    c.    Granting such other relief as the Court deems appropriate and necessary.

**PLAINTIFF DEMANDS TRIAL BY JURY ON ALL CLAIMS SO TRIABLE**.

Dated: April 5, 2023                                Respectfully Submitted,

                                                                   */s/ Larry Klayman*
                                                            Larry Klayman, Esq.
                                                            Klayman Law Group, P.A.
                                                            Florida Bar. No. 246220
                                                            7050 W. Palmetto Park Rd
                                                            Boca Raton FL 33433
                                                            Telephone: 561-558-5336
                                                            Email: leklayman@gmail.com

                                                            *Counsel for Plaintiffs*